IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DUJUAN POWE (#M39899), | ) |
| Petitioner, | ) ) ) |
| | ) No. 21-cv-02879 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| BRITTANY GREENE, Warden, Western Illinois Correctional Center, | ) ) ) |
| Respondent. | ) ) |

## MEMORANDUM OPINION AND ORDER

Kenyatae Collier was shot and killed on October 26, 2009 in a staged carjacking and planned murder. Petitioner DuJuan Powe and his brother, Darron Brewer, who was also Collier's husband, were convicted for the crime. The brothers were tried simultaneously by two separate juries. Powe's jury found that he was the gunman and convicted him of first-degree murder and aggravated kidnapping. He now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that his counsel committed four errors that rendered their assistance ineffective at trial and on appeal. In deciding the petition, however, this Court reaches the merits of only a single claim of ineffective assistance of counsel because procedural default bars review of the other three. And with respect to the one claim that Powe has preserved, three Illinois state courts previously rejected it because Power failed to establish prejudice—a decision that was consistent with, and a reasonable application of, *Strickland v. Washington*, 466 U.S. 668 (1984). Accordingly, this Court denies Powe's § 2254 petition and declines to issue a certificate of appealability.

I.  BACKGROUND

Moments before she was fatally shot, Collier uttered these words: "I love my kids." *People v. Powe*, 2020 IL App (1st) 173059-U, ¶ 14.[1] Police would later find Collier's body in the trunk of her husband's Chevrolet Monte Carlo, which Powe had abandoned in an alley on Chicago's Northwest side. *Id.* ¶¶ 14, 27–28. An autopsy would confirm that Collier was shot twice in the head at close range causing her death. *Id.* ¶ 31.

Sometime after midnight on October 26, 2009, while Brewer, his wife Collier, and their children had stopped for gas, Powe approached their vehicle and pretended to carjack them. *Id.* ¶ 14. He was disguised, wearing a mask from the horror movie "Scream." *Id.* ¶ 16. Powe had his hand in his pocket as he walked up to the Monte Carlo (suggesting he was armed with a gun) and got into the front passenger seat. *Id.* Brewer drove off, and they made their way to an alley where Powe put Collier in the trunk. *Id.* ¶¶ 14, 16. Powe then took over driving the vehicle, dropped off Brewer and his children, and found another alley. *Id.* ¶ 16. When Powe opened the trunk, Collier started to get out, pleading for her life. *Id.* But as she was getting back inside the trunk, Powe shot her in the head. *Id.*

At trial, the State focused on six witnesses in addition to testimony from Chicago police officers and other specialists describing the crime scene and investigation. Tarron Webb, Powe's cousin, testified that he received a call from Powe the night after the murder. *Id.* ¶ 8. Webb believed that the call came from a phone belonging to Powe's girlfriend, Benita Wallace. *Id.* According to Webb, Powe said, "I got her" and "I got that b***." *Id.* Weeks before that phone call, Powe had

---

[1] The Court's summary of the trial evidence is drawn from the Illinois appellate court's opinion in Powe's postconviction proceeding, *People v. Powe*, 2020 IL App (1st) 173059-U, the last reasoned decision addressing his only preserved ground of ineffective assistance. The state court's factual determinations are presumed correct, and Powe does not point to clear and convincing evidence that contradicts these facts. *See* 28 U.S.C. § 2254(e)(1); *Kidd v. Lemke*, 734 F.3d 696, 703 (7th Cir. 2013).

2

spoken with Webb about some recent events. *Id.* ¶ 7. According to Powe, Brewer wanted him to kill Collier because Brewer feared he and Collier would divorce if she found out he was gay. *Id.* And if they divorced, Brewer would not receive the payout from Collier's life insurance policy. *Id.* Powe told Webb that he initially attempted to strangle Collier (at Brewer's request), but he could not go through with it and had sex with her instead. *Id.*

Webb further testified that, in the past, Powe had worn a mask similar to the one in the horror movie "Scream," which was also similar to the mask depicted in a photograph entered into evidence at trial. *Id.* ¶ 9. And he confirmed that the vehicle depicted in other photographs entered into evidence was similar to Brewer and Collier's Monte Carlo. *Id.* On cross-examination, Webb clarified that Collier had already threatened to divorce Brewer because she had discovered that he was gay and that Powe claimed the sex with Collier was consensual and without force. *Id.* ¶ 10.

Tasha Nash, Powe's aunt, testified that the day before the murder Powe called her asking for .38 shells, which neither she nor anyone she knew had. *Id.* ¶ 12. Late the next night (still on October 26 but after the murder), Nash received a call from an agitated Powe but did not specify the phone that he used. *Id.* ¶¶ 13–14. Powe said he did "something stupid" and proceeded to confess to the murder. *Id.* ¶ 14. Powe told Nash that he pretended to carjack Brewer and Collier while they were at a gas station; they drove to an alley where he put Collier in the trunk; he then drove to Brewer's house to drop off Brewer and the children and made his way to another alley. *Id.* Once there, Powe opened the trunk and "Collier begged [him] not to 'do this to me' and stated, 'I live for my kids,' and 'I love my kids.' She then asked if she could 'use the bathroom.' [He] allowed her to do so, and as she returned to the trunk, he shot her in the head." *Id.* Nash did not initially believe Powe's story until a day later when she saw Collier's picture as part of a televised

3

news report about a woman's body found in the trunk of a car that looked like Brewer's Monte Carlo. *Id.* ¶ 15.

Nash also testified about Powe having had sex with Collier. *Id.* ¶ 12. Three weeks before Collier died, Nash, Powe, and Brewer had a conversation during which Brewer said Collier was going to accuse Powe of raping her at gunpoint. *Id*. But, as Nash explained, Powe said the sexual encounter was consensual and that Collier expressed feelings for him. *Id*.

Charles Reed testified that he was working at a gas station in the very early morning hours of October 26 when he witnessed a carjacking. *Id.* ¶ 16. He first noticed a woman's voice crying out for help. *Id*. Reed then looked to the gas pumps, where he noticed a vehicle and a man yelling for help as someone disguised in a "Scream" mask approached the vehicle while putting his hand in his pocket as if going for a gun. *Id*. The man who was yelling got into the driver's side of the car, the masked man got into the front passenger seat, and the car drove away. *Id*. Reed called the police and later identified one of the men involved in the carjacking as Brewer. *Id.* ¶¶ 17, 33. Photographs of the carjacking were entered into evidence. *Id.* ¶ 17.

Theresa Jones, Collier's mother, testified that around midday on October 26, Brewer showed up at her apartment and took clothes and diapers for his children. *Id.* ¶ 18. Jones inquired whether he had seen Collier, but Brewer said that "he had not seen Collier since 1 a.m., when she 'dropped him off and *** kept going.'" *Id*.

Wallace, Powe's girlfriend, testified that late at night on October 25 (hours before Collier was shot), she received a phone call for Powe. *Id.* ¶ 20. After he finished the call in private, Powe left her house. *Id*. Wallace did not see him again until the next morning. *Id*. She let Powe into her house, and they returned to her bed. *Id*. Wallace confirmed that a photograph entered into evidence

4

showed a firearm placed between her mattresses, but she explained that she had never seen the firearm before, did not know it was there, and did not give Powe permission to hide it there. *Id*.

Wallace also testified that she had been dating Powe for six to eight months and was pregnant with his child. *Id*. ¶ 19. She said that a week before Collier was shot, Powe had a "Scream" mask that they both used to scare children in the house; after Collier's death, she never saw it again. *Id*. Wallace further testified that Powe did not own a vehicle, did not have a cell phone, and was often picked up and dropped off by his brother, Brewer. *Id*.

Joshua Maddox, who other witnesses described as Brewer's boyfriend, testified that on the morning of October 26 he noticed he had received a text message and phone call from Brewer in the middle of the night. *Id*. ¶ 21. When Maddox got in touch with Brewer later that morning, Brewer informed Maddox that his wife and vehicle were missing. *Id*. Maddox volunteered to help, as he had his own vehicle. *Id*. After Maddox arrived at Brewer's apartment, he, Brewer, and Powe dropped off Brewer's children at daycare and drove to the police station. *Id*. ¶ 22. However, only Brewer went inside the station. *Id*. After leaving the police station, they drove to a "store front church," where Powe exited the vehicle with a "balled up" object, like a jacket. *Id*. Powe went through a gate at the back of the church and walked out of Maddox's sight. *Id*. After a few minutes, Powe returned to the vehicle, and the others dropped him off further down the block. *Id*.

Later that night, Maddox was driving Brewer home when they passed a Monte Carlo in an alley, and Brewer suggested that it might be his car. *Id*. ¶ 23. Maddox stopped and saw that the car had been "'ransacked.'" *Id*. Brewer called the police but he did not report that he had been carjacked the night before. *Id*. Maddox confirmed that photographs of the "carjacking" at the gas station depicted a vehicle that looked like Brewer's Monte Carlo and that Brewer was also depicted as the man walking to the vehicle and opening the trunk. *Id*. ¶ 24. Maddox denied that Brewer ever

5

told him he had been carjacked that night. *Id*. On cross-examination, Maddox confirmed that he and Brewer were in an intimate relationship and that he did not know Brewer was married until the night of October 26, when they were taken to the police station. *Id.* ¶ 25.

Chicago police officers initially dispatched after Brewer's call testified and described the crime scene. Just after midnight on October 27, they located the abandoned Monte Carlo in an alleyway on North Tripp Avenue, but Brewer was not there by the time they arrived. *Id.* ¶¶ 27, 33. Finding the main interior space of the vehicle empty, the officers opened the trunk, where they found a woman's body "laying face up in the trunk *** with dry blood stains on her face and upper body." *Id*. They also identified Brewer as the registered owner of the Monte Carlo. *Id.* ¶ 33. That same day, police searched Wallace's bedroom, finding a handgun as well as "clothing, a bag, and a wallet containing [Powe's] identification." *Id.* ¶ 27. Police interviewed Brewer, Maddox, Webb, Nash, and Wallace. *Id.* ¶¶ 33–34. They also identified Brewer in the gas station's surveillance footage. *Id.* ¶ 34. Two days later, on October 29, Powe turned himself in and was arrested. *Id.* ¶ 33.

Evidence technicians and forensic scientists testified that fingerprints lifted from the trunk's interior matched Collier's fingerprint but did not match Brewer's or Powe's fingerprints. *Id.* ¶¶ 28–29. A trace evidence analyst received a glove entered into evidence that was recovered from Wallace's bedroom. *Id.* ¶ 30. He tested the glove for gunshot residue but did not find all the necessary particles for a positive finding—he "found two of the three 'tri-component particles'" were present. *Id*. Another forensic scientist testified that the firearm recovered from the mattresses in Wallace's bedroom could fire .38 shells and that the bullets recovered from Collier's head were fired from that same firearm. *Id.* ¶ 32. But a full DNA profile could not be obtained from samples taken from the firearm, and it was concluded that "[Powe], Brewer, Maddox, and Collier did not contribute to the low level DNA profile" that was detected. *Id.* ¶ 26. It was possible, the DNA

analyst explained, that the low level profile could have come from the mattresses where police discovered the firearm. *People v. Powe*, 2016 IL App (1st) 133205-U, ¶¶ 12–13 (Powe's direct appeal). The medical examiner who performed Collier's autopsy determined that she died from "'multiple gunshot wounds'" consistent with being shot at close range while in the trunk of a vehicle. *Powe*, 2020 IL App (1st) 173059-U, ¶ 31.

In addition, the parties stipulated that if called to testify at trial, an agent from New York Life Insurance Company would testify that a life insurance policy valued at $100,000 covered Collier's life, as she was Brewer's spouse and he was an insured National Guard member. *Id.* ¶ 35. That same agent would also testify to the existence of an additional $5,000 life insurance policy, covering Collier's life as Brewer's spouse because he was an insured military member. *Id*. As for the items found in Wallace's bedroom, the parties stipulated that police recovered "a handgun, a bag containing men's clothing, a pair of men's gym shoes, a pair of men's gloves, a duffel bag, a wallet, and a hat." *Id*.

In his defense, Powe called one witness: a Chicago police detective who interviewed Collier's mother, Jones. *Id.* ¶ 37. The detective testified that he was seeking information about whether "Collier had ever mentioned being raped," of which Jones stated she had no knowledge. *Id*. The detective also testified that sometime before Collier was shot, "he had interviewed Collier, who confirmed that she had had problems with Brewer 'for a while.'" *Id*.

The jury ultimately found Powe guilty of kidnapping and murdering Collier. *Id.* ¶ 38. The state trial court sentenced him to a term of life imprisonment for first-degree murder and a consecutive 21-year term of imprisonment for aggravated kidnapping. *Id.* ¶ 40. As a result of Powe's direct appeal, his sentence on the kidnapping charge was reduced to a 15-year prison term, but the judgment was otherwise affirmed. *Id.* ¶ 41.

In his state postconviction proceedings, Powe challenged his convictions on the same four grounds that he now raises in his § 2254 petition. Specifically, Powe petitioned the state trial court for relief, alleging that his trial counsel committed two errors: (a) he failed to obtain Wallace's phone records for impeachment purposes, and (b) he failed to impeach Webb with inconsistent statements and cross-examine him about his use of the word "believe" in statements to police. (Dkt. No. 17-12 at 6–9.); *see Powe*, 2020 IL App (1st) 173059-U, ¶ 42. Powe also alleged that his appellate counsel committed two errors by failing to contend that Powe's trial counsel was ineffective because: (c) he failed to impeach Webb with a video recording of prior statements to police, and (d) he failed to impeach Nash with inconsistent statements. (Dkt. No. 17-12 at 11–12.); *see Powe*, 2020 IL App (1st) 173059-U, ¶ 43. The state trial court dismissed Powe's ineffective assistance of trial and appellate counsel claims on all four grounds during Illinois's first-stage postconviction proceedings. (*Id.* at 33, 41.) Powe then appealed that decision, arguing that the trial court erred in denying relief based on the trial counsel's failure to obtain Wallace's phone records. (Dkt. No. 17-7 at 4.)

The appellate court affirmed the dismissal on the basis that Powe failed to allege facts showing that he was prejudiced by trial counsel's failure to obtain the phone records, even though, the court explained, he stated enough to contend that counsel's performance was arguably deficient. *People v. Powe*, 2020 IL App (1st) 173059-U, ¶¶ 69, 77. Based on the low threshold for a contention of deficient performance at first-stage postconviction review, it was sufficient for Powe to point out that trial counsel failed to obtain Wallace's phone records despite his "multiple requests for his counsel to do so." *Id.* ¶ 69. The appellate court went on to explain, however, that Powe's petition lacked facts that could show a different result had counsel obtained and entered into evidence the desired phone records. *Id.* ¶¶ 73–77. The appellate court thus concluded that,

8

even with a lenient eye on review of Powe's claim, the "limited value Wallace's phone records would have had" could not overcome "the overwhelming, substantially corroborated evidence" of his guilt. *Id.* ¶ 77. The Illinois Supreme Court denied Powe's petition for leave to appeal ("PLA") in which he argued the same claim. *People v. Powe*, 175 N.E.3d 77 (Ill. 2021) (table); *see* (Dkt. No. 17-10 at 8–19.)

## II.  DISCUSSION

Powe seeks federal habeas relief under 28 U.S.C. § 2254, reasserting the same four errors that he previously alleged made his legal assistance ineffective. Specifically, Powe contends that his trial counsel was ineffective twice—first, for failing to obtain Wallace's phone records, and second, for failing to cross-examine and impeach Webb with inconsistent statements. And he also claims that his appellate counsel was ineffective twice—for failing to raise the ineffectiveness of his trial counsel based on the lack of impeachment of Webb and Nash. (Dkt. No. 1 at 6–9.) But because Powe failed to exhaust (without excuse) all but a single ground of ineffective assistance, and because the Illinois appellate court's decision on that preserved error was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, federal habeas relief is not available to him.

### A.  Claims Barred by Procedural Default

The Court first considers whether procedural default bars federal review of certain alleged errors that Powe claims rendered his legal counsel's assistance ineffective. Those errors include the failure of Powe's trial counsel to cross-examine and impeach Webb with inconsistent statements, and the failure of his appellate counsel to argue that his trial counsel was ineffective due to his lack of impeachment of Webb and Nash (together, "the Abandoned Errors"). Respondent contends that Powe is precluded from arguing those three errors before this Court because he

9

abandoned them at the Illinois appellate court—a fact that Powe concedes. (Dkt. No. 16 at 8–9.) Instead, Powe argues, without elaboration, that "because his postconviction appellate counsel refused to raise them," the Court should excuse his failure to exhaust. (Dkt. No. 1 at 9.)

To ensure that the Court's review of state convictions does not become "a substitute for ordinary error correction through appeal," a fundamental limit to habeas relief "requires state prisoners to exhaust the remedies available in the courts of the State." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1731–32 (2022) (cleaned up); 28 U.S.C. § 2254(b)(1)(A). "Total exhaustion," and the principle of comity that underlies it, directs "state prisoners to seek full relief first from the state courts, thus giving those courts the first opportunity to review all claims of constitutional error." *Rose v. Lundy*, 455 U.S. 509, 518–19 (1982). This threshold requirement for collateral review in federal court respects "the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993). Only state prisoners who present their claims in "one complete round of the State's established appellate review process" achieve the statutory exhaustion requirement. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).

Powe was required to assert all four grounds for his ineffective assistance claim at all levels of the Illinois courts, culminating with his PLA to the Illinois Supreme Court. *Pole v. Randolph*, 570 F.3d 922, 935 (7th Cir. 2009) ("Thus, if a petitioner fails to assert in the state courts a particular factual basis for the claim of ineffective assistance, that particular factual basis may be considered defaulted."); *Stevens v. McBride*, 489 F.3d 883, 894 (7th Cir. 2007). Yet he concedes that he did not totally exhaust the state's appellate review process for the Abandoned Errors. Indeed, through each stage of appellate review, Powe only asserted that his trial counsel committed an error because he did not obtain Wallace's phone records.

10

The Court may excuse Powe's procedural default only if he shows one of two things. *Davila v. Davis*, 137 S. Ct. 2058, 2064–65 (2017). Powe may show "cause" for his failure to exhaust and "actual prejudice as a result of the alleged violation of federal law," or alternatively, he may show that this Court's "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). Because Powe does not argue that federal review is necessary to prevent a fundamental miscarriage of justice—for instance, by claiming actual innocence—the Court considers whether he has established cause and prejudice.[2] *See Schlup v. Delo*, 513 U.S. 298, 324 (1995); *see Franklin v. Gilmore*, 188 F.3d 877, 884 (7th Cir. 1999) ("Franklin . . . does not make this argument and we will not make it for him.").

Powe contends that procedural default should not bar federal review simply by faulting his postconviction counsel for failing to present the Abandoned Errors at all levels of Illinois courts. Ineffective assistance of counsel may establish cause when there is a constitutional right to counsel at the time of the alleged ineffectiveness—if so, and petitioner was deprived effective assistance, his Sixth Amendment right would be violated. *Coleman*, 501 U.S. at 752–53. But there is no constitutional right to counsel during postconviction proceedings. *Id.* at 752. And without that independent constitutional right, ineffective assistance of postconviction counsel cannot qualify as cause to excuse procedurally defaulted claims. *Davila*, 137 S. Ct. at 2062, 2065; *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018) (declining to extend exceptions to the *Coleman* rule to Illinois prisoners). By pointing only to his postconviction counsel's fault, Powe has not shown cause to excuse his failure to exhaust. As a result, he is procedurally defaulted from raising the Abandoned Errors in a federal habeas petition.

---

[2] Even if Powe had argued excuse based on a fundamental miscarriage of justice, that argument would have failed because, as discussed below, the evidence of his guilt was overwhelming.

11

B.     **Preserved Claim of Ineffective Assistance of Trial Counsel**

Turning to the alleged error that Powe has preserved, he contends that his trial counsel was ineffective because he failed to obtain Wallace's phone records, which could have been used for impeachment purposes to show that Powe did not call either Nash or Webb to confess to Collier's murder. (Dkt. No. 1 at 6–7; Dkt. No. 22 at 1–2.) Respondent disagrees, arguing that the Illinois appellate court's rejection of the claim was consistent with, and a reasonable application of, the constitutional standard for ineffective assistance of counsel expressed in *Strickland*. (Dkt. No. 16 at 6–8.) But Powe contends that the Illinois appellate court's decision was not an adjudication on the merits that qualifies for § 2254(d) deference. (Dkt. No. 22 at 3–5.) Specifically, Powe asserts that, although the Illinois courts denied his claim because he failed to show he was prejudiced by his counsel's failure, the appellate court did not substantively entertain *Strickland*'s performance inquiry and therefore did not resolve his claim. (*Id.* at 5.)

The Antiterrorism and Effective Death Act ("AEDPA"), which narrowly circumscribes federal habeas review, bars relief for claims "adjudicated on the merits" in state court unless that court's decision was (1) "contrary to" or an "unreasonable application of clearly established federal law, as determined by the Supreme Court," or (2) based on an "unreasonable determination of the facts" presented in that court's proceeding. 28 U.S.C. § 2254(d). Within "the ambit of AEDPA," adjudication on the merits (like "a judgment") "is normally said to have been rendered on the merits only if it was delivered after the court . . . heard and evaluated the evidence and the parties' substantive arguments." *Flint v. Carr*, 10 F.4th 786, 796–97 (7th Cir. 2021) (cleaned up) (quoting *Johnson v. Williams*, 568 U.S. 289, 302 (2013) ("And as used in this context, the word merits is defined as the intrinsic rights and wrongs of a case as determined by matters of substance.") (cleaned up)). Put another way, "adjudication on the merits" is "a decision finally resolving the

12

parties' claims . . . that is based on the substance of the claim advanced." *Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001)).

In this case, there is no uncertainty regarding the finality of Powe's state postconviction petition. Both the Illinois trial and appellate courts evaluated the record, weighed Powe's arguments, and clearly explained their reasoning in dismissing Powe's collateral attack. *People v. Powe*, 2020 IL App (1st) 173059-U, ¶¶ 51, 65–77; (Dkt. No. 17-7 at 34–35, 37–38.) Each court also substantively (and unequivocally) applied Supreme Court precedent, relying on *Strickland*'s prejudice inquiry to deny postconviction relief. *Id.*; *see, e.g.*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). In doing so, the Illinois appellate court even agreed with Powe that, "for purposes of first-stage postconviction proceedings," he arguably showed counsel's performance was deficient. *People v. Powe*, 2020 IL App (1st) 173059-U, ¶¶ 67–69. *But see Dunn v. Jess*, 981 F.3d 582, 591 (7th Cir. 2020) ("Failing to prove either element defeats a petitioner's claim."). The Illinois Supreme Court then denied Powe's PLA without explanation, presumptively adopting the appellate court's findings and analysis. *Harrington v. Richter*, 562 U.S. 86, 100 (2011) ("This Court now holds and reconfirms that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"); *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

Because Powe received a substantive disposition on his postconviction petition, this Court affords deference to the Illinois appellate court's reasoned decision. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (holding that federal habeas courts look to "the last related state-court

decision that does provide a relevant rationale"). That deferential approach means this Court "simply reviews the specific reasons given by" the Illinois appellate court "and defers to those reasons if they are reasonable." *Id*. Accordingly, "a federal court shall not grant a writ of habeas corpus unless the earlier decision took an 'unreasonable' view of the facts or law." *Mays v. Hines*, 141 S. Ct. 1145, 1149 (2021). Federal review may upset a state court decision only if that "decision was so lacking in justification beyond any possibility for fairminded disagreement." *Id.* at 1149 (cleaned up).

For a Sixth Amendment ineffective assistance claim, the test established by *Strickland* requires a petitioner to show that "counsel's performance was deficient" and that "the deficient performance prejudiced" the petitioner's defense. 466 U.S. at 687. In considering Powe's collateral attack, the Illinois appellate court assumed without deciding that his counsel performed deficiently and instead "rested its analysis on" *Strickland*'s prejudice inquiry. And so this Court also confines its analysis to that inquiry. *Minnick v. Winkleski*, 15 F.4th 460, 469 (7the Cir. 2021); *Strickland*, 466 U.S. at 697; *see Dunn*, 981 F.3d at 591.

Prejudice is defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The Illinois appellate court concluded that "Wallace's phone records would only challenge a small portion" of the record evidence against Powe, which was "overwhelmingly strong." *People v. Powe*, 2020 IL App (1st) 173059-U, ¶ 73. The appellate court explained that, even accepting Powe's allegations about the phone records as true, those allegations "would merely show (1) that [he] did not specifically use **Wallace's** phone to call Webb and Nash, and (2) that the calls did not take place at the times Webb and Nash testified that [Powe] called them." *Id*. Proof of those two points would not "necessitate a finding from a jury that the calls never occurred at all;" in fact,

14

"the jury could still conclude that the calls were made from a different phone or took place at a different time." *Id*. So, in all likelihood, the phone records would "establish very little." *Id*.

The appellate court elaborated further, comparing the weight of the record evidence to the phone records' potential usefulness:

> Also significant is the fact that the State entered into evidence other instances in which defendant discussed facts pertaining to Collier's murder. Therefore, even if a jury were to conclude the two phone calls to Webb and Nash on October 26, 2009, did not occur, there was still strong evidence regarding highly incriminating statements made by defendant. Specifically, Webb testified that in early October 2009, he met with defendant in person. Defendant told him Brewer wanted defendant to "strangle" Collier so that Brewer could obtain the proceeds from Collier's life insurance policy. Nash also testified that on October 25, 2009, defendant called her and asked if she "had or knew someone with some .38 shells." Using Wallace's phone records to impeach Webb and Nash as to two other phone conversations would not necessarily affect the credibility of these other pieces of testimony.
>
> We also note that if Wallace's phone records were presented to a jury to show that defendant never called Nash using Wallace's phone, such evidence would not address the fact that Nash's testimony describing defendant's confession was closely corroborated by the State's other evidence. Nash testified that on October 26, 2009, at about 10 p.m., defendant called her and stated that while Brewer and Collier were at a gas station, defendant walked up to them and pretended to carjack them. Defendant also told Nash that he drove Brewer's vehicle into an alley, placed Collier in the trunk, dropped Brewer off at Brewer's house, drove to another alley, and shot Collier in that alley. This testimony was closely corroborated with photographs of video footage, which showed that on October 26, 2009, at about 12:38 a.m., a man identified as Brewer was apparently carjacked at a gas station by a man in a "Scream" mask. The testimony of a gas station worker reflected that Brewer was seen opening the trunk of his vehicle and looking into it at one point. Brewer's vehicle was later found in an alley, and Collier's body was found in the trunk.
>
> Moreover, as this court has previously observed, the general evidence of defendant's guilt was overwhelming. *Powe*, 2016 IL App (1st) 133205-U, ¶ 29. In corroboration with Nash's testimony that defendant called her and asked how to obtain ".38 shells," the State also entered evidence that the bullets recovered from Collier's head were fired from a firearm that could fire ".38 shells." The State even presented evidence that the bullets recovered from Collier's head were fired from the specific firearm that was recovered from between the mattresses in Wallace's bedroom. Wallace testified that the morning after Collier was murdered, defendant stopped by Wallace's house and got into bed with Wallace. Based on this testimony,

15

> a jury could have certainly concluded that defendant hid the firearm used to shoot Collier in between Wallace's mattresses at that time. Further, Webb and Wallace testified that defendant owned a "Scream" mask much like the mask worn by the apparent carjacker in the surveillance footage at the gas station.

*Id.* ¶¶ 74–76.

This Court finds no reason to disturb the Illinois appellate court's reasonable conclusion that Powe cannot show *Strickland* prejudice based on the "limited value Wallace's phone records would have had in challenging" the overwhelming "substantially corroborated evidence of" Powe's guilt. *Id.* ¶ 77; *see Watson v. Anglin*, 560 F.3d 687, 693 (7th Cir. 2009) ("Strong evidence of guilt can undermine a petitioner's claim that he was prejudiced by his attorney's errors."). The appellate court reasonably applied *Strickland* and took a reasonable view of the facts based on the record evidence. To overcome § 2254(d)'s deferential standard, Powe would have to show that the Illinois appellate court "blunder[ed] so badly that every fairminded jurist would disagree." *Mays*, 141 S. Ct. at 1149. That is not the case here. And, because the Illinois appellate court's "decision is one of severally equally plausible outcomes, § 2254(d) forecloses federal habeas corpus relief." *Bailey v. Lemke*, 735 F.3d 945, 951 (7th Cir. 2013). Thus, Powe's habeas corpus petition is denied on the merits with respect to the one ineffective assistance of counsel claim that he properly preserved.

### III.  CONCLUSION

For the reasons stated above, Powe's petition for writ of habeas corpus is denied. The Clerk will enter judgment in favor of Respondent and against Powe. This is a final judgment. Additionally, the Court declines to issue a certificate of appealability since Powe cannot make a substantial showing of the denial of a constitutional right or that reasonable jurists would debate, much less disagree with, this Court's resolution of his claims. *Arredondo v. Huibregtse*, 542 F.3d

1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2)); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

If Powe seeks to appeal this decision, he must file a notice of appeal in this Court within 30 days of the date the judgment is entered on the Court's docket. *See* Fed. R. App. P. 4(a)(1). Powe need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if he contends that this Court should reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of judgment. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

ENTERED:

Dated: December 29, 2023

_____
Andrea R. Wood
United States District Judge